**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § § § § § § § § § § § § § | **COMPLAINT FOR FORFEITURE *IN REM*** |
| **v.** | | |
| **APPROXIMATELY 12,083,379.32 USDT** | | *CIVIL ACTION NO.* **26-cv-2544** |
| **Defendant, *in rem.*** | | |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff, the United States of America, through the U.S. Attorney for the District of Columbia, brings this verified complaint for forfeiture in a civil action *in rem* against 12,083,379.32 USDT, hereinafter referred to as "**Defendant Property**," and alleges as follows:

**STATEMENT OF THE CASE**

1.      Criminals believed to be located abroad, their associates, and conspirators together stole funds from multiple U.S. victims. The funds were then laundered through a series of virtual currency addresses, and sometimes virtual currency exchanges, to evade detection and hide the origin of the funds. The **Defendant Property** constitutes proceeds traceable to those thefts and property involved in, and traceable to, this money laundering scheme.

2.      The United States of America seeks to lawfully forfeit the **Defendant Property** to punish and deter criminal activity by depriving criminals of property used in or acquired through illegal activities, and most importantly, to recover assets that may be used to compensate victims.[1]

---

[1] *See* United States Asset Forfeiture Program, *Our Mission*, https://www.justice.gov/afp.

## JURISDICTION AND VENUE

3. This Court has original jurisdiction of this civil action by virtue of 28 U.S.C. § 1345 because it has been commenced by the United States and by virtue of 28 U.S.C. § 1355(a) because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.

4. This Court has *in rem* jurisdiction over the **Defendant Property** under 28 U.S.C. § 1355(b).

5. Venue is proper in this judicial district under 28 U.S.C. § 1355(b)(2) because the property is subject to forfeiture under the laws of the United States and is controlled by Tether International S.A. de C.V. ("Tether"), which is domiciled in the country of El Salvador.

## NATURE OF THE ACTION AND STATURY BASIS FOR FORFEITURE

6. The United States files this *in rem* forfeiture action to seek forfeiture of **Defendant Property** as constituting proceeds of wire fraud and wire fraud conspiracy offenses, committed in violation of 18 U.S.C. §§ 1343, 1349, 2, and 3, and as involved in money laundering and money laundering offenses, committed in violation of 18 U.S.C. 1956(a)(1)(B)(i), 1956(h), 2, and 3.

7. Procedures for this action are mandated by Rule G of the supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and, to the extent applicable, 18 U.S.C. §§ 981 and 983 and the Federal Rules of Civil Procedure.

8. 18 U.S.C. § 981(a)(1)(A) mandates forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of section 18 U.S.C. §§ 1956, 1957 or 1960, or any property traceable to such property.

9. 18 U.S.C. § 981(a)(1)(C) mandates forfeiture of property constituting or derived from proceeds traceable to wire fraud, conspiracy to commit wire fraud, or any offense constituting "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such

offense. A violation of 18 U.S.C. § 1343, or a conspiracy to commit that offense, constitutes specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A) as an offense listed in 18 U.S.C. § 1961(1)(B).

10.     18 U.S.C. § 1343 provides that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, commits the violation of wire fraud.

11.     18 U.S.C. § 1349 provides that whoever attempts or conspires to commit a violation of 18 U.S.C. § 1343 shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

12.     18 U.S.C. § 1956(a)(1)(B)(i) provides in relevant part that whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity— . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" is guilty of concealment of money laundering.

13.     18 U.S.C. § 1956(a)(2)(B)(i) provides that whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of

unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, commits international money laundering.

14.     18 U.S.C. § 1956(h) provides that any person who conspires to commit any offense of 1956 or 1957 is subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

## PROPERTY INFORMATION

15.     The **Defendant Property** is 12083379.32 USDT, which is the equivalent to $12,086,914 in U.S. dollars (USD).  The **Defendant Property** is associated with the below virtual currency addresses:

a.  0x0996d2538f0e342b0410015cbaf179f21e2fdb76 ("**SUBJECT VIRTUAL CURRENCY ADDRESS-1**"), which held approximately 2,808,765.354943 USDT,

b.  0xf92ad00a9185ccf48364e285b875d4e84aa8c917 ("**SUBJECT VIRTUAL CURRENCY ADDRESS-2**"), which held approximately 52,671.627943 USDT,

c.  0x7c879169f739aabfd13a1e4842ed201393311708 ("**SUBJECT VIRTUAL CURRENCY ADDRESS-3**"), which held approximately 249,799.171451 USDT,

d.  0xe5264b95a492f88bec7c9861a43b55e12488c845 ("**SUBJECT VIRTUAL CURRENCY ADDRESS-4**"), which held approximately 490,000.029124 USDT,

e.  0xc51f80024cc7a1d98cb4052261d73b7f2da9a065 ("**SUBJECT VIRTUAL CURRENCY ADDRESS-5**"), which held approximately 2,000,000.02 USDT,

4

f.  0x01ea4398031809d0ac7add2db0632c1e52d68a40 ("**SUBJECT VIRTUAL CURRENCY ADDRESS-6**"), which held approximately 2,000,000.02562 USDT, and

g.  0xe493d6d5c461252db5ba890051820b697d0718f0 ("**SUBJECT VIRTUAL CURRENCY ADDRESS-7**"), which held approximately 4,500,000.0251 USDT (collectively, the "**SUBJECT VIRTUAL CURRENCY ADDRESSES**").

16.  The virtual currency associated with the **SUBJECT VIRTUAL CURRENCY ADDRESSES** is hereinafter referred to as the "**Defendant Property**."

17.  The United States has yet to take custody and control over the Defendant Property, which is held, and was voluntarily frozen by, Tether.

## **DEFINITIONS**

18.  **Virtual Currency:** Virtual currencies are digital representations of value that, like traditional coin and paper currency, function as a medium of exchange (i.e., they can be digitally traded or transferred and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin and Ether, are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use

algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

19.    **Blockchain:** A blockchain is a digital ledger run by a decentralized network of computers referred to as "nodes." Each node runs software that maintains an immutable and historical record of every transaction utilizing that blockchain's technology. Many digital assets, including virtual currencies, publicly record all their transactions on a blockchain, including all of the known balances for each virtual currency address on the blockchain. Blockchains consist of blocks of cryptographically signed transactions, and blocks are added to the previous block after validation and after undergoing a consensus decision to expose and resist tampering or manipulation of the data. There are many different blockchains used by many different virtual currencies. For example, Bitcoin in its native state exists of the Bitcoin blockchain, while Ether (or "ETH") exists in its native state on the Ethereum network.

20.    **Blockchain Analysis:** Law enforcement can trace transactions on blockchains to determine which virtual currency addresses are sending and receiving particular virtual currency. This analysis can be invaluable to criminal investigations for many reasons, including that it may enable law enforcement to uncover transactions involving illicit funds and to identify the person(s) behind those transactions. To conduct blockchain analysis, law enforcement officers use reputable, free open source blockchain explorers, as well as commercial tools and services. These commercial tools are offered by different blockchain-analysis companies. Through numerous unrelated investigations, law enforcement has found the information associated with these tools to be reliable.

21.    **Virtual Currency Address:** A virtual currency address is an alphanumeric string that designates the virtual location on a blockchain where virtual currency can be sent and received. A virtual currency address is associated with a virtual currency wallet.

22.    **Virtual Currency Exchange:** A virtual currency exchange ("VCE"), also called a virtual currency exchange, is a platform used to buy and sell virtual currencies. VCEs allow users to exchange their virtual currency for other virtual currencies or fiat currency, and vice versa. Many VCEs also store their customers' virtual currency addresses in hosted wallets. VCEs can be centralized (i.e., an entity or organization that facilitates virtual currency trading between parties on a large scale and often resembles traditional asset exchanges like the exchange of stocks) or decentralized (i.e., a peer-to-peer marketplace where transactions occur directly between parties).

23.    **Virtual Currency Wallet:** A virtual currency wallet (*e.g.,* a hardware wallet, software wallet, or paper wallet) stores a user's public and private keys, allowing a user to send and receive virtual currency stored on the blockchain. Multiple virtual currency addresses can be controlled by one wallet.

24.    **Unhosted Wallet:** An unhosted wallet, also known as a self-hosted, non-custodial wallet, is a virtual currency wallet through which the user has complete control over storing and securing their private keys and virtual currency. Unhosted wallets do not require a third party's involvement (*e.g.,* a virtual currency exchange) to facilitate a transaction involving the wallet. Unhosted wallets allow users to generate and manage their own unhosted wallet addresses.

25.    **Transaction Fee:** A transaction fee is a fee paid by the party sending virtual currency on a blockchain to reward miners and/or validators for verifying and validating transactions. Transaction fees vary by blockchain and can fluctuate based on factors such as blockchain network traffic and transaction sizes. Senders of virtual currency can increase the

transaction fees that they pay to have their transactions confirmed faster by miners and/or validators. Transaction fees are generally paid in a blockchain's native token (*e.g.*, Bitcoin on the Bitcoin blockchain). On the Ethereum network, these transaction fees are called "gas fees." Gas fees are transaction costs paid in Ether ("ETH"), or its fraction, gwei. These fees serve as a form of remuneration for validators who maintain and secure the network. Gas fees fluctuate based on supply, demand, and network capacity, and may increase during periods of network congestion.

26.     **Stablecoins:** Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, Tether (also known as USDT) is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

27.     **Tether:** Tether International S.A. de C.V. ("Tether") is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

28.     **Ether:** Ether ("ETH") is a virtual currency that is the native token used by the Ethereum blockchain, which is a blockchain with smart contract functionality.

29.     **Tron:** Tron is a blockchain with smart contract functionality.

30.     **USD Coin:** USD Coin ("USDC") is a "stablecoin" virtual currency with its value tied to the US dollar. USDC is issued by Circle Internet Financial, LLC.

31.     **Dai:** Dai ("DAI") is a "stablecoin" virtual currency with its value tied to the US dollar. DAI is issued by the decentralized autonomous organization MakerDAO.

## STATEMENT OF FACTS

### Background on Cryptocurrency Investment Fraud

32.     The USSS is investigating cryptocurrency investment fraud ("CIF") schemes, often referred to as "pig-butchering," a term derived from the Chinese-language word used to describe this scheme and its treatment of victims. In 2024 alone, more than 41,000 complaints of CIF were received by the Federal Bureau of Investigation's Internet Crime Complaint Center (IC3), resulting in $5.8 billion in reported losses.[2] CIF schemes are often orchestrated by Asia-based criminal syndicates, predominately operating in southeast Asia. In CIF schemes, criminals contact potential victims through seemingly misdirected text messages, dating applications, or other online platforms/forums with the goal of building rapport and relationships with the victims.

33.     Once that trust is established, the criminal recommends virtual currency investment by touting their own, or an associate's success in the field. Investment methods vary, but a common tactic is to direct a victim to a fake investment platform hosted on a website. These websites, and the investment platforms hosted there, are created by criminals to mimic legitimate platforms. The subject usually instructs and/or assists the victim with opening an account on a centralized virtual currency exchange, such as Coinbase or Crypto.com, and then walks the victim through transferring money from a bank account to that virtual currency exchange account. Next, the victim will usually receive instructions on how to transfer their virtual currency assets to the fake investment platform. On its surface, the platform typically shows lucrative returns, encouraging further investment. However, all deposited funds are actually routed to a virtual currency address controlled by the criminals.

---

[2] *See* Fed. Bureau of Investigation, Internet Crime Report 2024 at 36, https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf.

34.    In CIF schemes, the subjects will continue to encourage investments until victims have depleted their savings. Oftentimes, the subject will attempt to continue the scheme by coaching victims on taking out loans against their homes or borrowing money from friends and family. Inevitably, these victims generally run out of money and make attempts to withdraw their funds. However, victims are unable to do so and are provided various excuses as to why. For example, subjects will often levy a fake "tax" requirement, stating taxes must be paid on the proceeds generated from the platform. This is just an eleventh-hour effort by subjects to elicit more money from victims; ultimately, victims are locked out of their accounts and lose all their funds. Even when victims procure enough funds to pay these "taxes," the subjects will continue to concoct new excuses and fees for victims to pay.

**Overarching CIF Investigation Involving the SUBJECT VIRTUAL CURRENCY ADDRESSES**

35.    This investigation began with a referral from a private sector partner during a cryptocurrency sprint[3] which originated from a discovery of suspicious activity involving **SUBJECT VIRTUAL CURRENCY ADDRESS-1**. Investigators traced funds associated with this address and determined it funded 6 more addresses with USDT balances, **SUBJECT VIRTUAL CURRENCY ADDRESS 2-7,**[4] as shown below in Exhibit 1.

---

[3] A cryptocurrency sprint is a coordinated effort to disrupt scam networks and seize assets.
[4] All tracing was done using the Last In, First Out method, in which the most recent items are sold before older items. In cryptocurrency tracing, funds which enter an address most recently are included in transfers out of the address prior to funds which have been in the address for a longer period of time. This tracing method is hereinafter referred to as "LIFO."

**Exhibit 1 – Summary of SUBJECT VIRTUAL CURRENCY ADDRESSES**



36.     Investigators also conducted partial back-traces of the funds in and flowing through **SUBJECT VIRTUAL CURRENCY ADDRESS-1** and observed the majority of the funds, which were back-traced, originated from U.S. based exchanges and sent to initial deposit addresses believed to be controlled by unknown subjects. These initial deposit addresses were queried on complaint databases including the FBI's Internet Crimes Complaint Center ("IC3") and the Federal Trade Commission's ("FTC") Consumer Sentinel systems. These queries revealed at least 20 victims, who were tricked into depositing cryptocurrency into addresses provided by the fraudulent investment platforms. The funds from some of these victims were then traced into the **SUBJECT VIRTUAL CURRENCY ADDRESSES**.

37.     Investigators also served information requests and a grand jury subpoena to collect information on individuals who initiated transactions that funded the **Defendant Property**.

38.     In sum, based on the victims' reports, investigation of the fraudulent investment platforms they used, and the tracing of those victims' funds to the **SUBJECT VIRTUAL CURRENCY ADDRESSES**, the funds contained in the **SUBJECT VIRTUAL CURRENCY ADDRESSES** are believed to be proceeds of CIF wire fraud schemes, further described below, and are commingled with funds that are involved in the concealment of those proceeds as part of

a money laundering scheme. Therefore, the funds in the **SUBJECT VIRTUAL CURRENCY ADDRESSES** are subject to forfeiture as further set forth in this complaint.

39.    Investigators initially contacted Tether regarding the **SUBJECT VIRTUAL CURRENCY ADDRESSES** on November 25, 2025. Tether voluntarily blocklisted the addresses on November 28, 2025.

## SUBJECT VIRTUAL CURRENCY ADDRESS-1

40.    Over the course of its use from December 2024 to February 2026, **SUBJECT VIRTUAL CURRENCY ADDRESS-1** received approximately 31,196,306 USDT and sent approximately 28,387,541 USDT. Approximately 26,200,000 USDT of this outgoing USDT was sent to **SUBJECT VIRTUALL CURRENCY ADDRESSES 2-7**.

41.    **SUBJECT VIRTUAL CURRENCY ADDRESS-1** currently holds approximately 2,808,765 USDT. According to a blockchain analytics tool, used and reasonably relied on by law enforcement and the private sector, 97.03% of all funds received by this address have direct exposure[5] to other known CIF addresses and 2.77% have direct exposure to exchanges, including Binance.com and Crypto.com. Investigators traced the funds remaining in **SUBJECT CURRENCY ADDRESS-1** and observed activity consistent with the exposure analytics.

---

[5] "Direct exposure" is when a virtual currency address directly receives funds from or directly sends funds to another address without an intermediary.

42.     While not all the transactions that fund **SUBJECT VIRTUAL CURRENCY ADDRESS-1** could be back-traced due to the amount of time it would take even a team of investigators to trace every single transaction, more than 675,000 USDT currently stored in the address was traced back to exchanges in 76 transactions. These funds were initially deposited from exchanges into 51 un-hosted cryptocurrency addresses that are either subject-controlled or established at the direction of the subjects to further obfuscate the source of the funds. Three of these initial deposit addresses were reported to IC3 by four CIF scheme victims. A summary of the reports is below:

| Victim | Reported Loss | Date of Report | Location |
| --- | --- | --- | --- |
| MN | $25,000.00 | 1/12/2026 | California |
| MW | $222,604.00 | 4/15/2026 | California |
| LY | $300,000.00 | 3/9/2026 | Maryland |
| DL | $406,838.59 | 12/29/2025 | Ohio |

43.     **Victim MN**'s funds were traced to **SUBJECT VIRTUAL CURRENCY ADDRESS-1** and make up a portion of the **Defendant Property**.

### *Victim MN*

44.     **MN** was interviewed by the investigators in June 2026 and reported a loss of $25,000 to an investment scam.

45.     **MN** was initially contacted by an individual using the name Steven Tian ("**Tian**") on LinkedIn[6] in or around November 2025. After a brief conversation, **Tian** asked if they could connect outside of LinkedIn and provided a number. **MN** created a Google Voice number and used that to communicate with **Tian**. After about two months, **Tian** introduced **MN** to cryptocurrency and began encouraging her to invest. **Tian** told **MN** that he would teach her everything she needed

---

[6] A social networking platform.

to know about investing in cryptocurrency. **MN** downloaded Coinbase and was shared a platform by the name of Zsgzx (https://zdf-zx.it[.]com) by **Tian**. After purchasing $500 worth of ETH, **Tian** walked her through "investing" it through Zsgzx and withdrawing it through Crypto.com.

46.    **Tian** continued encouraging her to invest more through Zsgzx and suggested she could earn more by investing her retirement savings. Eventually, around November 2025, **Tian** told **MN** that there would soon be a particularly good investment opportunity. Following his instructions, on or about November 21, 2025, **MN** transferred about $25,000 to what she believed to be a legitimate investment platform.

47.    Sometime in December 2025, **MN** was told Zsgzx was updating its platform and to instead use the website zsgzxud[.]com going forward. Upon logging in to the website, she could see her previous investment and earnings. Following this change, on December 26, 2025, **MN** attempted to withdraw $1,000 from the platform and was unsuccessful. She contacted **Tian** about the withdrawal and was told the transaction was not complete and she needed to invest $50,000 more into the platform. Upon **VM**'s refusal to deposit additional funds, Tian stated he could not guarantee **VM** would be able to withdraw any of her funds.

### *Trace of Victim MN's Funds and Other Suspected Victim Funds to SUBJECT VIRTUAL CURRENCY ADDRESS-1*

48.    The $25,000 **MN** sent to the address provided to her by the fraudulent investment platform was traced to **SUBJECT VIRTUAL CURRENCY ADDRESS-1** after being swapped from USDC to DAI and from DAI to USDT, making up a portion of the Defendant Property.[7]

---

[7] *See* Exhibit 2.

**Exhibit 2 – Summary of the Flow of Funds from Victim MN to SUBJECT VIRTUAL CURRENCY ADDRESS-1**



49.    Including the above transactions from **MN**, investigators identified 76 suspected victim[8] transactions that could be traced to the **Defendant Property**. A summary of the amount of funds which originated from each transaction and is currently held in the **Defendant Property** stored in **SUBJECT VIRTUAL CURRENCY ADDRESS-1** is below in Exhibit 3.

---

[8] Initiators of these transactions are believed to likely be victims based on the analysis of the flow of their funds and the investigation described in this affidavit.

**Exhibit 3 – Suspected Victim Transactions Traced to the SUBJECT VIRTUAL CURRENCY ADDRESS-1 (all values are approximate)**

| Entity | USD | USD in Address | Timestamp (UTC) |
|---|---|---|---|
| Coinbase | $3,768.58 | $3,768.58 | 11/21/2025 5:02 |
| Coinbase | $2,877.75 | $2,877.75 | 11/21/2025 4:35 |
| Kraken | $62,480.69 | $46,977.00 | 11/20/2025 20:31 |
| Coinbase | $24,981.44 | $24,981.44 | 11/22/2025 1:17 |
| Banxa | $1,517.46 | $1,517.46 | 11/13/2025 18:17 |
| Binance | $2,545.08 | $2,545.08 | 11/13/2025 17:35 |
| Binance | $4,740.77 | $4,740.77 | 11/12/2025 7:27 |
| BitBank | $3,137.97 | $3,137.97 | 11/25/2025 3:24 |
| BitBank | $53,368.54 | $49,929.00 | 11/21/2025 12:13 |
| BitBank | $4,147.64 | $4,147.64 | 11/17/2025 8:36 |
| BitBank | $12,338.46 | $12,338.46 | 11/27/2025 3:27 |
| bitFlyer | $54,541.90 | $26,623.00 | 11/27/2025 3:29 |
| bitFlyer | $21,668.20 | $21,668.20 | 11/25/2025 3:37 |
| bitFlyer | $5,948.41 | $5,948.41 | 11/18/2025 7:21 |
| bitFlyer | $6,130.80 | $6,130.80 | 11/25/2025 1:20 |
| bitFlyer | $11,121.32 | $11,121.32 | 11/25/2025 6:39 |
| Bitget | $184,635.94 | $99,577.00 | 11/25/2025 19:44 |
| Bitget | $1,158.97 | $1,158.97 | 11/13/2025 19:18 |
| Bitget | $4,054.90 | $4,054.90 | 11/13/2025 11:26 |
| Bitget | $2,869.98 | $2,869.98 | 11/8/2025 15:29 |
| Bitget | $1,146.46 | $1,146.46 | 11/9/2025 10:59 |
| Bitget | $1,147.78 | $1,147.78 | 11/9/2025 18:20 |
| Bitget | $1,293.71 | $1,159.44 | 9/30/2025 14:01 |
| Bitget | $5,629.31 | $5,629.31 | 11/12/2025 13:58 |
| Bitget | $9,892.24 | $9,892.24 | 11/12/2025 19:21 |
| Bitget | $2,630.30 | $2,630.30 | 11/13/2025 17:03 |
| Bitget | $2,694.01 | $2,694.01 | 11/12/2025 9:38 |
| Bitget | $1,112.17 | $1,112.17 | 11/13/2025 20:35 |
| Bitget | $1,871.46 | $1,871.46 | 11/13/2025 18:34 |
| Bitget | $932.76 | $932.76 | 11/13/2025 10:09 |
| BitoPro | $3,216.44 | $3,216.44 | 11/17/2025 14:50 |
| BitoPro | $3,189.67 | $3,189.67 | 11/17/2025 16:08 |
| Bitpanda | $17,288.03 | $17,288.03 | 11/13/2025 18:15 |
| Bybit | $3,178.44 | $3,178.44 | 11/17/2025 4:04 |
| Coinbase | $1,823.26 | $1,823.26 | 11/21/2025 4:26 |

16

| | | | |
|---|---|---|---|
| Coinbase | $43,089.01 | $43,089.01 | 11/27/2025 0:06 |
| Coinbase | $1,985.33 | $1,985.33 | 11/24/2025 23:37 |
| Coinbase | $4,581.36 | $4,581.36 | 11/24/2025 18:49 |
| Coinbase | $1,160.23 | $1,160.23 | 11/13/2025 9:55 |
| Coinbase | $1,162.53 | $1,162.53 | 11/13/2025 18:50 |
| Coinbase | $1,162.66 | $1,162.66 | 11/13/2025 18:47 |
| Coinbase | $937.31 | $937.31 | 10/31/2025 13:59 |
| Crypto.com | $2,734.20 | $2,734.20 | 11/23/2025 23:14 |
| Crypto.com | $3,400.33 | $3,400.33 | 11/13/2025 20:14 |
| Crypto.com | $640.07 | $640.07 | 11/13/2025 17:39 |
| Crypto.com | $1,745.90 | $1,745.90 | 11/13/2025 12:30 |
| Crypto.com | $636.02 | $636.02 | 11/13/2025 12:12 |
| Crypto.com | $2,462.69 | $2,462.69 | 11/13/2025 17:34 |
| Crypto.com | $4,514.42 | $4,514.42 | 11/13/2025 9:48 |
| Crypto.com | $2,448.46 | $2,448.46 | 11/13/2025 11:30 |
| Crypto.com | $1,990.73 | $1,990.73 | 11/13/2025 12:55 |
| Crypto.com | $3,069.13 | $3,069.13 | 11/13/2025 12:14 |
| Crypto.com | $2,466.05 | $2,466.05 | 11/13/2025 12:06 |
| Kraken | $34,925.32 | $34,925.32 | 11/22/2025 0:02 |
| Kraken | $93,104.42 | $88,935.00 | 11/20/2025 3:08 |
| Kraken | $16,376.46 | $7,633.00 | 11/13/2025 15:57 |
| Kraken | $34,132.89 | $34,132.89 | 11/12/2025 18:31 |
| Mercuryo | $998.78 | $998.78 | 11/11/2025 15:31 |
| Mercuryo | $1,009.71 | $1,009.71 | 11/11/2025 17:53 |
| Mercuryo | $1,092.95 | $1,092.95 | 11/7/2025 16:05 |
| Mercuryo | $1,121.82 | $1,121.82 | 11/7/2025 15:58 |
| Mercuryo | $997.97 | $997.97 | 11/11/2025 15:26 |
| Mercuryo | $990.30 | $990.30 | 11/12/2025 18:15 |
| Mercuryo | $979.68 | $979.68 | 11/12/2025 11:20 |
| Mercuryo | $997.05 | $997.05 | 11/12/2025 9:51 |
| Newton | $1,269.60 | $1,269.60 | 11/23/2025 19:16 |
| Newton | $2,116.07 | $2,116.07 | 11/13/2025 22:40 |
| Newton | $1,058.90 | $1,058.90 | 11/13/2025 20:31 |
| Revolut | $1,708.51 | $1,708.51 | 11/9/2025 21:30 |
| Revolut | $1,219.63 | $1,219.63 | 11/7/2025 18:49 |
| Shakepay | $3,016.66 | $3,016.66 | 11/25/2025 0:09 |
| Shakepay | $7,013.39 | $7,013.39 | 11/25/2025 0:47 |
| Shakepay | $1,051.44 | $1,051.44 | 11/25/2025 0:35 |
| Shakepay | $993.48 | $993.48 | 11/24/2025 23:21 |

17

| Shakepay | $6,998.49 | $6,998.49 | 11/13/2025 19:01 |
|---|---|---|---|
| Shakepay | $2,338.22 | $2,338.22 | 11/13/2025 19:07 |
| **Total** | **$820,779.01** | **$675,810.79** | |

50.    Flow of these victim funds to the **SUBJECT VIRTUAL CURRENCY ADDRESS-1** is shown below in Exhibit 4. Overall, of the 2,808,765 USDT stored in the address, approximately $675,810 was traced back to the 76 known and suspected victim transactions.

**Exhibit 4 – Flow of Funds from Suspected Victims to SUSPECT VIRTUAL CURRENCY ADDRESS-1**



**VIRTUAL CURRENCY ADDRESS-2**

51.     Over the course of its use from July 2025 to March 2026, **SUBJECT VIRTUAL CURRENCY ADDRESS-2** received approximately 6,001,000 USDT and sent approximately 5,948,328 USDT. Approximately 6,000,000 USDT of this incoming USDT was sent from **SUBJECT VIRTUALL CURRENCY ADDRESS-1**.

52.     **SUBJECT VIRTUAL CURRENCY ADDRESS-2** currently holds approximately 52,671 USDT. Investigators traced these funds backwards and determined all 52,671 USDT originates from one transaction from Coinbase as shown in Exhibit 5. Investigators served a grand jury subpoena to Coinbase for information on the initiator of this transaction and received KYC and transaction information for **Victim JH** on June 5, 2026.

53.     **JH** only responded to one email in which he asked investigators what they needed, but he did not answer to investigators' efforts to interview him. [9] Coinbase records show the funds which are used in the purchase of the cryptocurrency which is transferred through the subject address and is eventually deposited into **SUBJECT VIRTUAL CURRENCY ADDRESS-2** originate from a personal account at Wells Fargo Bank under a name that matches **JH**. Thus, investigators believe **JH** to be a victim.

---

[9] Victims of CIF schemes and cybercrime scams are often reluctant to respond to outreach for fear that they are being victimized once again. Indeed, in some scams, the perpetrators attempt to revictimize existing victims by posing as government authorities and then seeking financial payments/fees purportedly, but fraudulently, represented as needed to secure the return of previously stolen funds.

**Exhibit 5 – Trace of Victim JH's Funds to SUBJECT VIRTUAL CURRENCY ADDRESS-2**



**VIRTUAL CURRENCY ADDRESS-3**

54.    Over the course of its use from February 2025 to May 2026, **SUBJECT VIRTUAL CURRENCY ADDRESS-3** received approximately 4,499,999 USDT and sent approximately 4,250,200 USDT. Approximately 3,000,000 USDT of this incoming USDT was sent from **SUBJECT VIRTUALL CURRENCY ADDRESSES-1**.

55.    **SUBJECT VIRTUAL CURRENCY ADDRESS-3** currently holds approximately 249,799 USDT. While not all the transactions that fund **SUBJECT VIRTUAL CURRENCY ADDRESS-3** were back-traced due to the amount of time it would take even a team of investigators to trace every single transaction, more than 160,000 USDT currently stored in the address was traced back to exchanges in 14 transactions.

56.     These funds were initially deposited from exchanges into 10 un-hosted cryptocurrency addresses that are either subject-controlled or established at the direction of the subjects to further obfuscate the source of the funds. Four of these initial deposit addresses were reported to IC3 by four CIF scheme victims. A summary of the reports is below:

| Victim | Reported Loss | Date of Report | Location |
|--------|---------------|----------------|----------|
| SW | $380,116.81 | 2/7/2025 | Connecticut |
| ON | $14,500.00 | 3/6/2025 | Oklahoma |
| BA | $60,000.00 | 5/2/2025 | California |
| KP | $90,470.66 | 6/6/2026 | California |

57.     Approximately $17,356 of the funds sent by **Victim KP** were traced to the **Defendant Property** stored in **SUBJECT VIRTUAL CURRENCY ADDRESS-3.**

### *Victim KP*

58.     **Victim KP** was interviewed by the investigators around June of 2026 and reported a loss of approximately $90,470 to a CIF scheme.

59.     **KP** was initially contacted in January 2025 by an individual using the name Emily Anne Davis ("**Davis**") claiming to be a recruiter for a part time job at "Peaky Digital." **KP** was told this job would involve helping developers improve rankings and ratings of their applications, making them stand out in app stores, and would take around 30 to 60 minutes a day.

60.     **Davis** sent her the Peaky Digital workbench to register for a work account at peakydigitalpxs[.]com and informed her Peaky Digital makes payments in cryptocurrency, so she had to use a Coinbase account for the transactions.

61.     **KP** reported that every day she logged onto the workbench, she would get an address to deposit USDC. After the deposit was made and data sets were completed, she would be eligible for a withdrawal. **KP** also reports the site ran multiple promotions, including a 2025 Anniversary Event promising bonuses for fund deposits, and "lucky data" hits that required

additional deposits to continue "working."

62.     Eventually, **KP** attempted a withdrawal and was told her status with the site, VIP 1, was not enough to withdraw as much as she had in her account balance. To resolve the issue, she was told to upgrade to VIP 3, which involved an additional deposit of $10,000. Once she made this payment, she was told her account was frozen and required a 50% unfreezing fee before she could withdraw any funds. She made this deposit as well, believing it would allow her to withdraw her funds. Then, **KP** was told her credit points were insufficient for a withdrawal. Her account had 70 credit points, and she needed to pay $28,000 more to restore her credit points to 98 before she could make any withdrawals. Following her payment, she received a withdrawal process, but the withdrawal was once again blocked. **KP** was told she had to pay 35% in taxes to obtain a tax certificate for large crypto withdrawals. She made a portion of this payment and has been unable to contact anyone associated with the service since.

### *Trace of Victim KP's Funds and Other Suspected Victim Funds to SUBJECT VIRTUAL CURRENCY ADDRESS-3*

63.     At least $17,356 of funds **KP** sent to the address provided to her by the fraudulent employment platform was traced to **SUBJECT VIRTUAL CURRENCY ADDRESS-3** after being swapped from USDC to USDT, making up a portion of the **Defendant Property**. Exhibit 6.

**Exhibit 6 – Summary of the Flow of Funds from Victim KP to SUBJECT VIRTUAL CURRENCY ADDRESS-3**



64.     Including the transaction made by **KP**, investigators identified 14 suspected victim[10] transactions that could be traced to the **Defendant Property**. A summary of the amount of funds which originated from each transaction and is currently held in the **Defendant Property** stored in **SUBJECT VIRTUAL CURRENCY ADDRESS-3** is below in Exhibit 7.

**Exhibit 7 – Suspected Victim Transactions Traced to the SUBJECT VIRTUAL CURRENCY ADDRESS -3 (all values are approximate)**

| Entity | USD | USD in Address | Timestamp (UTC) |
|---|---|---|---|
| Coinbase | $5,023.00 | $5,023.00 | 2/20/2025 23:27 |
| Coinbase | $6,305.00 | $6,305.00 | 2/20/2025 18:50 |
| Coinbase | $6,028.00 | $6,028.00 | 2/20/2025 18:45 |
| Coinbase | $5,023.34 | $5,023.00 | 2/20/2025 23:31 |
| Coinbase | $35,655.34 | $35,655.34 | 2/20/2025 21:15 |
| Coinbase | $4,837.85 | $2,767.00 | 2/20/2025 19:07 |
| Coinbase | $24,079.11 | $24,079.11 | 2/20/2025 20:18 |

---

[10] These individuals are believed to likely be victims based on the analysis of the flow of their funds and the investigation described in this affidavit.

| Coinbase | $13,491.22 | $13,416.00 | 2/19/2025 17:42 |
| Coinbase | $378.08 | $378.08 | 2/18/2025 22:53 |
| Crypto.com | $4,869.96 | $4,869.96 | 2/21/2025 2:18 |
| Gemini | $45,172.12 | $45,172.12 | 2/20/2025 15:58 |
| Gemini | $4,969.78 | $4,969.78 | 2/19/2025 20:16 |
| PayPal | $6,042.43 | $6,042.43 | 2/19/2025 22:09 |
| Uphold | $1,465.30 | $1,465.30 | 2/21/2025 2:13 |
| **Total** | **$163,340.54** | **$161,194.12** | |

65.     Flow of these victim funds to the **SUBJECT VIRTUAL CURRENCY ADDRESS-3** is shown below in Exhibit 8. Overall, of the approximately 249,799 USDT stored in the address, approximately $161,194 was traced back to the 14 known and suspected victim transactions.

**Exhibit 8 – Flow of Funds from Suspected Victims to SUSPECT VIRTUAL CURRENCY ADDRESS-3**



**SUBJECT VIRTUAL CURRENCY ADDRESS-4**

66.    Over the course of its use from September 2025 to December 2026, **SUBJECT VIRTUAL CURRENCY ADDRESS-4** received approximately 5,200,000 USDT and sent approximately 4,710,000 USDT. All 5,200,000 USDT of this incoming USDT was sent from **SUBJECT VIRTUAL CURRENCY ADDRESS-1.**

67.    **SUBJECT VIRTUAL CURRENCY ADDRESS-4** currently holds approximately 490,000 USDT. While not all the transactions that fund **SUBJECT VIRTUAL CURRENCY ADDRESS-4** were back-traced due to the amount of time it would take even a team of investigators to trace every single transaction, more than 146,000 USDT currently stored in the address was traced back to exchanges in 24 transactions. These funds were initially deposited from exchanges into 17 un-hosted cryptocurrency addresses that are either subject-controlled or established at the direction of the subjects to further obfuscate the source of the funds. One of these initial deposit addresses was reported to IC3 by a CIF scheme victim. A summary of the report is below:

| Victim | Reported Loss | Date of Report | Location |
|---|---|---|---|
| AR | $13,000.00 | 11/18/2025 | Saudi Arabia |

68.    **Victim AR**'s funds were traced to **SUBJECT VIRTUAL CURRENCY ADDRESS-4** and are currently stored in the address.

*Victim AR*

69.    **Victim AR** was interviewed by the investigators in June 2026 and reported a loss of $13,000 to an investment scam.

70.    **AR** reports that he was in communication with an individual using the name Melis Eren ("**Eren**") on WhatsApp. **Eren** introduced him to an investment platform using the name USwap on ethvk[.]vip and walked him through how to deposit cryptocurrency into it from his Bybit account through an Onchain[11] wallet. In images provided by the victim, **Eren** uses marked screenshots to instruct **AR** through each step of the process. As **AR**'s funds in the platform appeared to be growing, **AR** reports having attempted a withdrawal request, which prompted a message that informed him he can only withdraw funds after an account verification, which involved making a payment of $16,000. Documents provided by **AR** are shown below in Exhibit 9.

**Exhibit 9 – Screenshots Provided by Victim AR**



---

[11] A non-custodial wallet service offered by Crypto.com.

*Trace of Victim AR's Funds and Other Suspected Victim Funds to SUBJECT VIRTUAL CURRENCY ADDRESS-4*

71.     Approximately $6,326 of funds **AR** sent to the address provided to him by the fraudulent employment platform was traced to **SUBJECT VIRTUAL CURRENCY ADDRESS-4**, making up a portion of the **Defendant Property**, which is shown below in Exhibit 10.

**Exhibit 10 – Summary of the Flow of Funds from Victim AR to SUBJECT VIRTUAL CURRENCY ADDRESS-4**



72.     Including the transaction made by **AR**, investigators identified 24 suspected victim[12] transactions that could be traced to the **Defendant Property**. A summary of the amount of funds which originated from each transaction and is currently held in the **Defendant Property** stored in **SUBJECT VIRTUAL CURRENCY ADDRESS-4** is below in Exhibit 11.

---

[12] These individuals are believed to likely be victims based on the analysis of the flow of their

**Exhibit 11 – Suspected Victim Transactions Traced to the SUBJECT VIRTUAL CURRENCY ADDRESS-4 (all values are approximate)**

| Entity | USD | USD in Address | Timestamp (UTC) |
|---|---|---|---|
| Binance | $2,299.38 | $2,299.38 | 10/23/2025 20:46 |
| Binance | $6,010.14 | $6,010.14 | 10/29/2025 17:17 |
| Binance | $3,161.81 | $3,161.81 | 10/27/2025 13:23 |
| Binance | $4,793.19 | $4,793.19 | 11/1/2025 9:45 |
| Binance | $2,333.95 | $2,333.95 | 10/28/2025 10:05 |
| Binance | $3,003.92 | $3,003.92 | 10/27/2025 11:11 |
| Binance | $2,530.44 | $2,530.44 | 10/31/2025 10:12 |
| Binance | $7,704.54 | $7,704.54 | 10/27/2025 10:02 |
| Binance | $4,915.61 | $4,915.61 | 10/23/2025 17:40 |
| Binance | $4,505.54 | $4,505.54 | 10/21/2025 11:24 |
| Binance | $15,340.76 | $15,340.76 | 10/27/2025 19:23 |
| Binance | $1,048.59 | $1,048.59 | 10/28/2025 9:12 |
| Binance | $2,097.70 | $2,097.70 | 10/30/2025 19:01 |
| Binance | $2,312.93 | $2,312.93 | 10/28/2025 11:45 |
| Binance | $1,246.07 | $1,246.07 | 10/19/2025 16:46 |
| Binance | $2,776.02 | $2,776.02 | 10/19/2025 5:59 |
| Binance | $1,285.20 | $1,285.20 | 10/10/2025 16:36 |
| Binance | $5,117.02 | $5,117.02 | 10/8/2025 14:37 |
| bitFlyer | $5,607.34 | $5,607.34 | 10/27/2025 3:16 |
| Bybit | $6,326.08 | $6,326.08 | 10/30/2025 14:29 |
| Crypto.com | $53,041.43 | $53,041.43 | 7/14/2024 11:50 |
| Crypto.com | $2,175.79 | $2,175.79 | 7/12/2024 15:43 |
| Crypto.com | $5,791.44 | $5,791.44 | 7/14/2024 14:29 |
| Revolut | $919.77 | $919.77 | 10/28/2025 8:34 |
| **Total** | **$146,344.66** | **$146,344.66** | |

73.    Flow of these victim funds to the **SUBJECT VIRTUAL CURRENCY ADDRESS-4** is shown below in Exhibit 12. Overall, of the approximately 490,000 USDT stored in the address, approximately $146,344 was traced back to the 24 known and suspected victim transactions.

_____

funds and the investigation described in this affidavit.

**Exhibit 12 – Flow of Funds from Suspected Victims to SUSPECT VIRTUAL CURRENCY ADDRESS-4**



**SUBJECT VIRTUAL CURRENCY ADDRESS-5**

74.    Over the course of its use from February 2025 to January 2026, **SUBJECT VIRTUAL CURRENCY ADDRESS-5** received approximately 2,000,000.02 USDT and did not send any funds. Approximately 2,000,000 USDT of this incoming USDT was sent from **SUBJECT VIRTUALL CURRENCY ADDRESSES-1** and is still in the address.

75.    Approximately 1,000,000 USDT of what is currently in **SUBJECT VIRTUAL CURRENCY ADDRESS-5** was traced back to one transaction from Binance into initial deposit address  0x74931b84a0af4da363ccad84f759dd26b90f4e43  ("0x7493").  Exhibit 13.  Further, according to a reliable blockchain analytics tool, used and reasonably relied on by law enforcement and the private sector, 4.09% of all funds received by this address have direct exposure to other known CIF addresses and 95.85% have direct exposure to exchanges, including Binance.com and OKX.

76.    Because transfers into initial deposit addresses from victims are usually smaller and take place over multiple transfers, which is also consistent with what the investigators  observed in this case based on victim interviews and transaction information, the investigators believe this transaction was initiated by the money launderers in an effort to use Binance as an additional layer to obfuscate the source of the funds. Because tracing through exchanges takes a considerably longer amount of time and tracing each transaction would be difficult even for a team of investigators, this transaction from Binance was not further back-traced and did not lead to the identification of victims the funds were sourced from. However, because money launderers do not usually commingle legitimate funds with illegitimate funds, and as previously stated, at least 4.09% of all funds received by this address have direct exposure to other known CIF

addresses, this transaction is believed to be funded by proceeds originating from unknown CIF scam victims.

**Exhibit 13 – Trace of Funds from Binance into SUBJECT VIRTUAL CURRENCY ADDRESS-5**



77.    Further, investigators served a request for information to Binance on June 3, 2026, for information on the account that initiated this transfer into 0x7493. Binance provided transaction and account holder information on June 4, 2026.

78.    According to Binance records which were acquired through letterhead request, the funds traced from Binance to **SUBJECT VIRTUAL CURRENCY ADDRESS-5** were held in an account opened by the Cambodian national "JianZong Huang". Know Your Customer ("KYC") information provided to Binance at account initiation is shown on Exhibit 14.

**Exhibit 14 – KYC Document Provided by Binance**



79.     The transaction information shows approximately 45,045,481 USDT was deposited into this Binance account, from May 2021 to April 2022. Four deposits, at least partially, funded the withdrawal that could be traced to the **Defendant Property**.

80.     While most of the funding of these deposits were transactions from other non-US based exchanges, like HTX and Gate, approximately 46,329 USDT of the 2,000,000.02 USDT stored in **SUBJECT VIRTUAL CURRENCY ADDRESS-5** was traced back to one transaction of 214.12 ETH, approximately $736,588, from Coinbase.

81.    Investigators served a grand jury subpoena to Coinbase for account information of the user who initiated this transaction. On June 5, 2026, Coinbase provided KYC and transaction information of **Victim RK.** While **RK** did not respond to investigators' efforts to interview him,[13] Coinbase records show the funds used in the transfer to the subject address which eventually were deposited into **SUBJECT VIRTUAL CURRENCY ADDRESS-5** were sourced from a personal account at Union Bank under a name that matches his last name and appears to belong to a relative.

82.    Flow of these funds from Coinbase to **SUBJECT VIRTUAL CURRENCY ADDRESS-5** is shown below in Exhibit 15.

---

[13] Victims of CIF schemes and cybercrime scams are often reluctant to respond to outreach for fear that they are being victimized once again. Indeed, in some scams, the perpetrators attempt to revictimize existing victims by posing as government authorities and then seeking financial payments/fees purportedly (but fraudulently) represented as needed to secure the return of previously stolen funds.

**Exhibit 15 – Flow of Victim RK's Funds into SUBJECT VIRTUAL CURRENCY ADDRESS-5**



**SUBJECT VIRTUAL CURRENCY ADDRESS-6**

83.    Over the course of its use from November 2025 to May 2026, **SUBJECT VIRTUAL CURRENCY ADDRESS-6** received approximately 2,000,000.03 USDT and did not send any USDT. Approximately 2,000,000 USDT of this incoming USDT was sent from **SUBJECT VIRTUALL CURRENCY ADDRESSES-1**.

84.    **SUBJECT VIRTUAL CURRENCY ADDRESS-6** currently holds all 2,000,000 USDT received from **SUBJECT VIRTUAL CURRENCY ADDRESS-1**. While not all the transactions that fund **SUBJECT VIRTUAL CURRENCY ADDRESS-6** were back-traced due to the amount of time it would take even a team of investigators to trace every single transaction, more than 370,000 USDT currently stored in the address was traced back to exchanges in 43 transactions. These funds were initially deposited from exchanges into 30 un-hosted cryptocurrency addresses that are either subject-controlled or established at the direction of the subjects to further obfuscate the source of the funds. Three of these initial deposit addresses were reported to IC3 by five CIF scheme victims. A summary of the reports is below:

| Victim | Reported Loss | Date of Report | Location |
|--------|---------------|----------------|----------|
| PK | $127,999.00 | 11/14/2025 | Arizona |
| PG | $39,990.00 | 11/19/2025 | Pennsylvania |
| VA | $9,000.00 | 12/17/2025 | Ireland |
| SC | $433,656.08 | 12/9/2025 | Canada |
| JB | $15,000.00 | 12/2/2025 | Texas |

85.    Another victim, **Victim KG,** was identified through a transaction hash which he reported to IC3. Investigators traced approximately $21,654 of his funds to the **Defendant Property**.

### *Victim KG*

86.    **KG** was interviewed by investigators in June 2026 and reported a loss of $130,000 to a romance scam.

87.     **KG** reports he initially reached out to a profile on Community Matrimony[14] that listed a phone number, appearing to belong to a woman (the "**Subject**"). **KG** and the **Subject** began communicating through WhatsApp. After a couple days, the **Subject** introduced him to a cryptocurrency investment platform and showed him what appeared to be her earnings.

88.     Believing it was legitimate, **KG** also began investing with the platform. He initially invested $1,000. The dashboard showed his investment growing, so he transferred more money into the platform and took out loans to invest further. Throughout the scheme, he reports using two websites: https://www[.]cryptotradewheel[.]top and https://www[.]becoitdir[.]com.

89.     **KG** then began receiving messages asking for fees and taxes. This included a "personal asset tax" that stated he owed 35% tax on his "profits" and that the platform would cover 5%. The platform instructed him to pay this tax in cryptocurrency within 5 business days in order to process any withdrawals. Believing this tax was legitimate, he transferred the funds as payment.

90.     **KG** realized the platform was fraudulent after multiple unsuccessful attempts to withdraw his money.

### *Trace of Victim KG's Funds and Other Suspected Victim Funds to SUBJECT VIRTUAL CURRENCY ADDRESS-6*

91.     Approximately $21,654 of funds **KG** sent to the address provided to him by the fraudulent employment platform was traced to **SUBJECT VIRTUAL CURRENCY ADDRESS-6,** after being swapped from ETH to USDT, and makes up a portion of the **Defendant Property** as shown below in Exhibit 16.

---

[14] An online dating platform.

**Exhibit 16 – Summary of the Flow of Funds from Victim KG to SUBJECT VIRTUAL CURRENCY ADDRESS-6**



92.    Including the transactions made by **KG**, investigators identified 43 suspected victim[15] transactions that could be traced to the **Defendant Property**. A summary of the amount of funds which originated from each transaction and is currently held in the **Defendant Property** stored in **SUBJECT VIRTUAL CURRENCY ADDRESS-6** is below in Exhibit 17.

**Exhibit 17 – Suspected Victim Transactions Traced to the SUBJECT VIRTUAL CURRENCY ADDRESS -6 (all values are approximate)**

| Entity | USD | USD in Address | Timestamp (UTC) |
|---|---|---|---|
| Binance | $4,991.36 | $4,991.36 | 11/17/2025 16:42 |
| Binance | $2,602.09 | $2,602.09 | 11/8/2025 10:58 |
| Binance | $3,795.14 | $3,795.14 | 11/22/2025 9:50 |
| Binance | $1,557.57 | $1,557.57 | 11/22/2025 14:24 |

---

[15] These individuals are believed to likely be victims based on the analysis of the flow of their funds and the investigation described in this affidavit.

39

| | | | |
|---|---|---|---|
| Binance | $2,772.98 | $2,772.98 | 11/22/2025 15:46 |
| Binance | $3,159.87 | $3,159.87 | 11/22/2025 16:14 |
| Binance | $1,579.53 | $1,579.53 | 11/22/2025 15:27 |
| Bitcoin4u | $4,678.18 | $4,678.18 | 11/22/2025 17:24 |
| bitFlyer | $20,591.27 | $20,591.27 | 11/15/2025 0:56 |
| bitFlyer | $47,834.44 | $47,834.44 | 11/14/2025 21:54 |
| Bitget | $22,185.45 | $22,185.45 | 11/17/2025 16:08 |
| Coinbase | $21,654.69 | $21,654.69 | 11/5/2025 21:01 |
| Coinbase | $9,794.45 | $9,794.45 | 11/10/2025 15:34 |
| Coinbase | $13,293.02 | $13,293.02 | 11/10/2025 17:09 |
| Coinbase | $189,842.66 | $53,474.36 | 11/21/2025 17:22 |
| Coinbase | $4,794.10 | $4,794.10 | 11/21/2025 18:12 |
| Coinbase | $2,906.90 | $2,906.90 | 11/21/2025 10:29 |
| Coinbase | $1,933.69 | $1,933.69 | 11/22/2025 3:02 |
| Coinbase | $592.16 | $592.16 | 11/22/2025 20:10 |
| Coinbase | $288.90 | $288.90 | 11/22/2025 17:24 |
| Coinbase | $301.79 | $301.79 | 11/22/2025 9:41 |
| Crypto.com | $94,439.55 | $12,672.00 | 10/27/2025 22:48 |
| Crypto.com | $11,545.15 | $11,545.15 | 11/21/2025 15:07 |
| Crypto.com | $1,908.24 | $1,908.24 | 11/21/2025 2:34 |
| Crypto.com | $5,099.52 | $5,099.52 | 11/19/2025 18:44 |
| Crypto.com | $2,131.55 | $2,131.55 | 11/22/2025 21:10 |
| Crypto.com | $4,189.75 | $4,189.75 | 11/22/2025 23:11 |
| Gemini | $4,832.00 | $4,832.00 | 11/5/2025 20:50 |
| Kraken | $46,135.36 | $46,135.36 | 11/21/2025 19:04 |
| Kraken | $9,895.76 | $9,895.76 | 11/21/2025 19:02 |
| Kraken | $2,998.72 | $2,998.72 | 11/21/2025 19:00 |
| Kraken | $1,499.56 | $1,499.56 | 11/22/2025 18:33 |
| Kraken | $2,535.96 | $2,535.96 | 11/22/2025 14:21 |
| Netcoins | $1,200.17 | $1,200.17 | 11/22/2025 22:18 |
| Pluto BTM | $1,769.27 | $1,769.27 | 11/22/2025 19:20 |
| Robinhood | $4,936.13 | $4,936.13 | 11/21/2025 18:19 |
| Robinhood | $5,757.21 | $5,757.21 | 11/21/2025 6:06 |
| Shakepay | $4,162.15 | $4,162.15 | 11/5/2025 20:21 |
| Shakepay | $3,998.82 | $3,998.82 | 11/22/2025 19:39 |
| Shakepay | $6,997.93 | $6,997.93 | 11/22/2025 16:17 |
| Uphold | $1,999.36 | $1,999.36 | 11/22/2025 3:17 |
| Uphold | $978.56 | $978.56 | 11/21/2025 4:02 |
| Uphold | $14,990.95 | $14,990.95 | 11/21/2025 16:59 |

| Total | $595,151.89 | $377,016.04 |
|-------|-------------|-------------|

93.    Flow of these victim funds to the **SUBJECT VIRTUAL CURRENCY ADDRESS-6** is shown below in Exhibit 18. Overall, of the approximately 2,000,000 USDT stored in the address, approximately $377,016 was traced back to the 43 known and suspected victim transactions.

**Exhibit 18 – Flow of Funds from Suspected Victims to SUSPECT VIRTUAL CURRENCY ADDRESS-6**



**SUBJECT VIRTUAL CURRENCY ADDRESS-7**

94.     Over the course of its use from October 2025 to February 2026, **SUBJECT VIRTUAL CRRENCY ADDRESS-7** received approximately 10,500,000.02 USDT and sent approximately 6,000,000 USDT. Approximately 8,000,000 USDT of this incoming USDT was sent from **SUBJECT VIRTUAL CURRENCY ADDRESS-1.** Additionally, approximately 2,500,000 USDT was sent from **SUBJECT VIRTUAL CURRENCY ADDRESS-4,** which, as mentioned, is funded solely by **SUBJECT VIRTUAL CURRENCY ADDRESS-1**.

95.     **SUBJECT VIRTUAL CURRENCY ADDRESS-7** currently holds approximately 4,500,000 USDT. While not all the transactions that fund **SUBJECT VIRTUAL CURRENCY ADDRESS-7** were back-traced due to the amount of time it would take even a team of investigators to trace every single transaction, more than 430,800 USDT currently stored in the address was traced back to exchanges in 55 transactions. These funds were initially deposited from exchanges into 39 un-hosted cryptocurrency addresses that are either subject-controlled or established at the direction of the subjects to further obfuscate the source of the funds. One of these initial deposit addresses was reported to IC3 by three CIF scheme victims. A summary of the reports is below:

| Victim | Reported Loss | Date of Report | Location |
|--------|--------------|----------------|----------|
| JN | $202,495.13 | 11/18/2025 | Georgia |
| VP | $199,178.00 | 11/11/2025 | Michigan |
| YP | $342,295.00 | 4/4/2026 | Vermont |

96.     **Victim JN**'s and **Victim YP**'s funds were traced to **SUBJECT VIRTUAL CURRENCY ADDRESS-7** and are currently, at least partially, stored in the address.

43

*Victim JN*

97.    **Victim JN** was interviewed by the investigators in or around June 2026 and reported being the victim of a romance scam. He was initially contacted by a woman using the name Linlin Tan ("**Tan**") via text messages. Their communication then moved to Telegram. After building trust and what **JN** believed to be a genuine relationship, she encouraged him to start investing with a gold trading platform called FXveris, which he downloaded via AppStore.[16] **JN** reports that **Tan** was telling him when to invest and how much to invest, as demonstrated below in Exhibit 19. With the platform dashboard showing substantial earnings, **JN** continued depositing funds as directed by **Tan**, investing about $80,000.

**Exhibit 19 – Screenshots of Communications with Tan Provided by Victim JN**

 

---

[16] Digital marketplace available to users of Apple devices, where they can browse for and download software applications for their devices.

98.     Believing his deposits had earned returns, **JN** attempted to withdraw his funds and was told he had to pay a verification fee of $39,013.12 to process any withdrawals. He paid this fee as directed by **Tan**. Following this payment, he was told his account was flagged for insider trading and that he had to pay another fee of $141,400 to avoid being reported to the authorities. **JN** borrowed money from his father in order to pay this fee due to the false pretense of being reported to law enforcement officials. Upon being asked to pay another fee, $200,000, to reactivate his account, he became skeptical and realized he had fallen victim to a CIF scam.

### *Victim YP*

99.     **Victim YP** was interviewed by investigators in June 2025 and provided documentation showing a loss of about $342,295. The files were received on June 5, 2026.

100.    **YP** reports that he was initially contacted on LinkedIn by someone using the name Grace Lin ("**Lin**"). After several exchanges on LinkedIn, **Lin** suggested their conversation move to WhatsApp. **Lin**'s screen name on WhatsApp was Shuyi Lin. In their WhatsApp chat, **YP** reports receiving a picture of her California drivers license, and despite **Lin** stating it was sent on accident, **YP** reports this increasing his trust in **Lin** being a real person.

101.    Around September 2025, **Lin** began insisting that she knew how to trade in the financial market and offered to provide the capital to **YP**. **Lin** walked **YP** through installing Base Wallet[17] utilizing screenshots to guide him through each step. **Lin** then instructed him to register with mobile[.]premiertradingplatform[.]com and connect his Base Wallet. Exhibit 20. **YP** then began depositing funds, believing them to be legitimate investments. The platform showed his balance increasing with each deposit and allowed him to withdraw $50, which increased his confidence in the platform.

---

[17] An un-hosted wallet service offered by Coinbase.

**Exhibit 20 – Screenshot of Communications with Lin Provided by YP**



102.    Upon making a request to withdraw the full balance shown on his account, approximately $1,455,722, the platform required an additional payment of $145,572 that would incur a daily penalty of 3%. Shortly after **YP**'s unsuccessful attempt to withdraw funds, **Lin** stopped responding to his messages.

*Trace of Victim JN and YP's Funds and Other Suspected Victim Funds to SUBJECT VIRTUAL CURRENCY ADDRESS-7*

103.    Approximately $48,849 of **JN**'s funds and approximately $50,000 of the 168,000 USDC **YP** transferred into the scheme were traced to **SUBJECT VIRTUAL CURRENCY ADDRESS-7**, making up a portion of the **Defendant Property**, as shown below in Exhibit 21.

**Exhibit 21 – Summary of the Flow of Funds from Victim YP and Victim JN to SUBJECT VIRTUAL CURRENCY ADDRESS-7**



104.    Including the transactions made by **JN** and **YP**, investigators identified 55 suspected victim[18] transactions that could be traced to the **Defendant Property**. A summary of the amount of funds which originated from each transaction and is currently held in the **Defendant Property** stored in **SUBJECT VIRTUAL CURRENCY ADDRESS-7** is below in Exhibit 22.

**Exhibit 22 – Suspected Victim Transactions Traced to the SUBJECT VIRTUAL CURRENCY ADDRESS-7 (all values are approximate)**

| Entity | USD | USD in Address | Timestamp (UTC) |
|---|---|---|---|
| Binance | $1,728.06 | $1,728.06 | 11/5/2025 10:08 |
| Binance | $3,290.73 | $3,290.73 | 11/5/2025 10:42 |
| Binance | $9,604.14 | $9,604.14 | 11/3/2025 13:38 |
| Binance | $4,406.11 | $4,406.11 | 11/5/2025 9:05 |
| Binance | $6,409.56 | $6,409.56 | 11/6/2025 16:21 |
| Binance | $3,935.64 | $3,935.64 | 11/5/2025 14:28 |
| Binance | $13,101.74 | $13,101.74 | 11/4/2025 15:29 |

---

[18] These individuals are believed to likely be victims based on the analysis of the flow of their funds and the investigation described in this affidavit.

| | | | |
|---|---|---|---|
| Binance | $21,999.54 | $21,999.54 | 11/5/2025 16:53 |
| Binance | $13,993.04 | $13,993.04 | 11/6/2025 12:06 |
| Binance | $4,929.39 | $4,929.39 | 10/31/2025 13:28 |
| Binance | $51,302.53 | $51,302.53 | 11/5/2025 21:07 |
| Coinbase | $3,745.43 | $3,745.43 | 11/6/2025 15:38 |
| Coinbase | $2,410.96 | $2,410.96 | 11/5/2025 14:40 |
| Coinbase | $8,069.82 | $8,069.82 | 11/6/2025 15:16 |
| Coinbase | $4,485.76 | $4,485.76 | 11/4/2025 17:23 |
| Coinbase | $3,360.09 | $3,360.09 | 10/31/2025 21:23 |
| Coinbase | $167,982.11 | $50,023.00 | 10/10/2025 4:32 |
| Coinbase | $7,082.14 | $7,082.14 | 11/5/2025 15:32 |
| Crypto.com | $19,536.07 | $19,536.07 | 11/6/2025 15:51 |
| Crypto.com | $1,566.37 | $1,566.37 | 11/6/2025 15:47 |
| Crypto.com | $5,205.84 | $5,205.84 | 11/5/2025 19:38 |
| Crypto.com | $2,805.40 | $2,805.40 | 11/5/2025 21:09 |
| Crypto.com | $1,363.57 | $1,363.57 | 11/5/2025 18:50 |
| Crypto.com | $5,368.84 | $5,368.84 | 11/5/2025 14:04 |
| Crypto.com | $2,075.63 | $2,075.63 | 11/5/2025 9:43 |
| Crypto.com | $2,570.40 | $2,570.40 | 11/5/2025 19:00 |
| Crypto.com | $2,564.41 | $2,564.41 | 11/5/2025 10:38 |
| Crypto.com | $16,605.42 | $16,605.42 | 11/3/2025 19:30 |
| Crypto.com | $3,558.58 | $3,558.58 | 11/4/2025 21:22 |
| Crypto.com | $4,273.16 | $4,273.16 | 11/4/2025 19:15 |
| Crypto.com | $38,996.29 | $38,996.29 | 11/5/2025 1:16 |
| Crypto.com | $9,843.05 | $9,843.05 | 11/5/2025 1:30 |
| Crypto.com | $12,862.94 | $12,862.94 | 11/10/2025 19:27 |
| Firi | $1,885.30 | $1,885.30 | 11/5/2025 15:29 |
| Kraken | $2,162.22 | $2,162.22 | 11/5/2025 20:20 |
| Mercuryo | $1,923.32 | $1,923.32 | 11/5/2025 10:39 |
| Newton | $706.38 | $706.38 | 11/11/2025 21:13 |
| Revolut | $1,054.41 | $1,054.41 | 11/5/2025 13:50 |
| Shakepay | $2,804.80 | $2,804.80 | 11/6/2025 16:09 |
| Shakepay | $6,998.60 | $6,998.60 | 11/6/2025 17:27 |
| Shakepay | $6,998.62 | $6,998.62 | 11/5/2025 18:29 |
| Shakepay | $13,997.23 | $13,997.23 | 11/10/2025 19:49 |
| Shakepay | $1,241.56 | $1,241.56 | 11/9/2025 1:17 |
| Shakepay | $3,999.21 | $3,999.21 | 11/10/2025 19:43 |
| Shakepay | $2,878.25 | $2,878.25 | 11/10/2025 18:19 |

| | | | |
|---|---|---|---|
| Shakepay | $1,091.52 | $1,091.52 | 11/8/2025 19:29 |
| Shakepay | $703.98 | $703.98 | 11/8/2025 23:55 |
| Shakepay | $4,182.17 | $4,182.17 | 11/10/2025 21:19 |
| Shakepay | $6,999.98 | $6,999.98 | 11/7/2025 20:11 |
| Shakepay | $2,039.63 | $2,039.63 | 11/7/2025 17:43 |
| Shakepay | $4,221.12 | $4,221.12 | 11/7/2025 16:09 |
| Shakepay | $2,118.63 | $2,118.63 | 11/12/2025 0:15 |
| Shakepay | $458.37 | $458.37 | 11/11/2025 15:17 |
| SwissBorg | $11,380.93 | $11,380.93 | 11/5/2025 9:50 |
| SwissBorg | $11,380.82 | $7,942.00 | 11/5/2025 8:07 |
| **Total** | **$552,259.81** | **$430,861.88** | |

105.    Flow of these victim funds to the **SUBJECT VIRTUAL CURRENCY ADDRESS-7** is shown below in Exhibit 23. Overall, of approximately 4,500,000 USDT stored in the address, approximately $430,860 was traced back to the 55 known and suspected victim transactions.

**Exhibit 23 – Flow of Funds from Suspected Victims to SUSPECT VIRTUAL CURRENCY ADDRESS-7**



**Defendant Property's Involvement in Money Laundering Offenses**

106.    The victims identified in this investigation, along with suspected and unidentified victims, were defrauded as part of wire fraud schemes, in violation of Title 18, United States Code, Sections 1343 and 1349 when unidentified subjects knowingly participated in a scheme to defraud them, in part by using materially false and/or fraudulent pretenses, representations, and promises that their cryptocurrency deposits were for legitimate cryptocurrency investments, and these pretenses, representations, and promises were conveyed to the victims through the use of wire communications in interstate or foreign commerce—i.e., messages over various U.S.-based message applications, wireless carriers, and social media providers.

107.    In addition to committing these wire fraud violations, subjects and/or their co-conspirators also committed money laundering offenses. First, based on the investigators' experience in investigating CIF scams over the past several years, and based on significant amounts of open source reporting, almost all CIF scam operations involving the solicitation and initial transfer of victim funds are believed to emanate from foreign-based individuals, predominantly in Southeast Asia.[19] Therefore, the unidentified subjects are believed to have committed international concealment money laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i) by transferring funds from a place in the U.S. (victims' cryptocurrency purchased through U.S. virtual currency exchanges) to virtual currency addresses controlled outside of the U.S., knowing that the funds involved in the transfers represented wire

---

[19] *See e.g.,* Lily Hay Newman & Matt Burgess, *The Pig Butchering Invasion Has Begun*, WIRED (Sept. 30, 2024, 6:00 AM), https://www.wired.com/story/pig-butchering-scam-invasion/, ("Such "pig butchering" operations have largely been concentrated in Myanmar, Cambodia, and Laos, typically rooted in Chinese organized crime groups exploiting instability and poor governance in the region. . . . [P]ig butchering operations that are offshoots of the Southeast Asian activity have emerged in the Middle East, Eastern Europe, Latin America, and West Africa.")

fraud proceeds from U.S. victims, and to conceal the nature, location, source, ownership or control of the wire fraud proceeds.

108.    Furthermore, based on analysis of the transaction activity involving the subject-controlled addresses that first received the victims' funds, the multiple intermediary addresses that later received, commingled, and consolidated confirmed/suspected victims' funds (including with funds of unidentified origins), and the **SUBJECT VIRTUAL CURRENCY ADDRESSES** which has held and still currently holds over a million dollars' worth of cryptocurrency, these addresses were used in a coordinated fashion to make transactions designed to conceal the nature, location, source, ownership, or control of wire fraud proceeds in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

109.    Such transaction activity, for example, is seen through the transfer of victim funds, as displayed in Exhibits 4, 8, 12, 18, and 23. First, the victim funds were sent to a subject-controlled address from a cryptocurrency exchange. These addresses are provided to victims by the criminals as unattributed "0 Level" deposit addresses to evade identification or potential interference. Such is the case with the initial deposit addresses that were queried on IC3 to identify aforementioned victims. Additionally, these addresses are oftentimes only shared with one victim to reduce the likelihood that their address is flagged to law enforcement.

110.    Funds were then rapidly sent through multiple cryptocurrency addresses, often with multiple transactions on the same day. Once deposited into the 0 Level initial deposit addresses, it is common for the funds to flow quickly from address to address before reaching a consolidation wallet, where the funds might rest for a longer period, allowing criminals time to comingle those funds with other illicit gains before moving the funds again towards a cash-out point where they can convert the pool of funds to fiat currency.

111.    Some funds were also sent through decentralized exchanges, like Tokenlon, and, for a fee, converted into a different asset on a different blockchain, in this case USDT on the Ethereum blockchain. Decentralized exchanges ("DEXs") allow users to swap one cryptocurrency type for another, often without having to provide any identifying information, so users can remain anonymous. The funds then flowed to the **SUBJECT VIRTUAL CURENCYT ADDRESSES**.

112.    All of the victim funds in this case were converted into USDT, which is very common as scammers are able to stabilize the value of their proceeds by converting them to a stablecoin which pegs its value to the U.S. dollar.

113.    Criminals will often conduct multiple otherwise unnecessary transactions in the transfer of funds, incurring transaction costs, to layer ill-gotten funds to ultimately conceal or disguise the nature, location, source, ownership, or control of those proceeds. The large number of quick transfers between these intermediary addresses and ultimately to **SUBJECT VIRTUAL CURRENCY ADDRESSES** is a strong indication that the movement of funds was performed in a manner meant to conceal or disguise the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity (in this case, wire fraud). There is no reason, economic or otherwise, for legitimate businesses or individuals to conduct cryptocurrency transfers in the above fashion. Whether transferring Bitcoin ("BTC") or USDT, each individual cryptocurrency transfer costs money. For USDT, that cost comes through the payment of transactions fees. It is reasonable to assume that businesses and individuals would strive to minimize those fees by conducting transfers with as few transactions, or "hops," as possible. Furthermore, each transaction delays the whole process, defeating one of the key attributes of virtual currency as a quick means of exchange.

114.   These intermediary addresses have made many high-value transactions, followed by a pattern of rapid movement of funds with large corresponding withdrawals. Each intermediary address has a zero, or very low, USDT balance. From the time of these intermediary addresses' first use each transferred approximately millions of dollars' worth of cryptocurrency.

115.   Additionally, based on the investigators' experience investigating other CIF scams, the transaction patterns displayed in this investigation are very commonly seen in CIF laundering investigations, with victims' funds from multiple different deposit addresses being funneled into a common consolidation address (**SUBJECT VIRTUAL CURRENCY ADDRESS-1**) before being sent to multiple additional addresses, the other **SUBJECT VIRTUAL CURRENCY ADDRESSES**. The common flow of the victims' funds shows that these addresses were part of a network of addresses that were used to receive and conceal wire fraud proceeds.

116.   Criminals involved in the laundering of proceeds from scams such as CIF do not typically commingle clean funds with stolen funds outside of the purpose of further laundering the CIF funds. Therefore, even if not all of the **Defendant Property** in the **SUBJECT VIRTUAL CURRENCY ADDRESSES** are directly traceable to known victims, all funds being deposited into the **SUBJECT VIRTUAL CURRENCY ADDRESSES** are likely to consist of the proceeds of cryptocurrency investment fraud schemes, or similar scams, and are commingled for the purpose of concealing, disguising, and laundering the funds.

## COUNT ONE – FORFEITURE OF DEFENDANT PROPERTY

### (18 U.S.C. § 981(a)(1)(C))

117.    The Defendant Property includes property constituting or derived from proceeds traceable to wire fraud and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349.

118.    Accordingly, the Defendant Property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C).

## COUNT TWO – FORFEITURE OF DEFENDANT PROPERTY

### (18 U.S.C. § 981(a)(1)(A))

119.    The Defendant Property constitutes property involved (a) domestic and international concealment of money laundering transactions committed in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i), (b) a conspiracy to engage in money laundering, committed in violation of Title 18, United States Code, Section 1956(h).

120.    Accordingly, the Defendant Funds are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A).

### PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that this Honorable Court issue a warrant of arrest *in rem* according to law; that judgment be entered declaring that the Defendant Property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney


/s/ Rick Blaylock, Jr.
Rick Blaylock, Jr.
TX Bar No. 24103294
Assistant United States Attorney
Asset Forfeiture Coordinator
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-6765
rick.blaylock.jr@usdoj.gov

56

**VERIFICATION**

I, John Schmitz, a Special Agent with the United States Secret Service, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *in rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 20th day of July 2026.

John Schmitz
Special Agent
United States Secret Service